ELMHURST CONVALESCENT CENTER, INC., ET AL., APPELLANTS, *v.* BATES ET AL., APPELLEES.

(No. 75AP-237—Decided October 30, 1975.)

*Messrs. Lucas, Prendergast, Albright, Gibson, Brown & Newman,* for appellants.

*Mr. William J. Brown,* attorney general, and *Mr. Geoffrey E. Webster,* for appellees.

McCORMAC, J.  Plaintiffs, the appellants herein, are nursing homes meeting requirements as skilled or inter-

mediate care facilities under Title XIX of the Social Security Act. They brought a class action on behalf of themselves and all similar facilities who offer skilled nursing services or intermediate care nursing services to the medically indigent under the medicaid programs of the state and federal governments. In their complaint, they sought a determination that defendants pay them not less than $17 per day for medicaid patients receiving care in a skilled nursing facility, and not less than $15 per day per patient for those in an intermediate care facility, during fiscal year 1975.

The case was submitted to the trial court upon an agreed statement of facts. The stipulated facts show defendants paid plaintiffs, since July 1, 1974, the reasonable cost of care up to a maximum of $17 per day in a skilled nursing facility and the reasonable cost of care up to the maximum of $15 per day in an intermediate care facility. It was further stipulated that the reasonable cost basis of payment has been less than the maximum of $17 and $15 a day for many of the homes.

The trial court found that defendants have been paying plaintiffs at the proper statutory rate and entered judgment for defendants. Plaintiffs have filed a timely notice of appeal, setting forth the following assignment of error:

"The trial court erred in finding that during fiscal 1975 skilled nursing home providers lawfully may be paid less than $17.00 a day per Medicaid patient and that during fiscal year 1975 intermediate care facility providers lawfully may be paid less than $15.00 a day per Medicaid patient."

The validity of plaintiffs' argument depends upon the construction of Amended Substitute House Bill No. 86, as originally passed, together with the effect of a veto by Governor Gilligan of a portion of that bill.

The pertinent part of Am. Sub. H. B. No. 86 provides as follows:

"Payments to nursing homes, including qualified public facilities for vendor nursing home care, shall be made for reasonable costs of care for all eligible recipients on the following basis: For patients determined by the de-

partment of public welfare to need nursing care who receive such care in a home which meets federal requirements as a skilled nursing facility under Title XIX of the Social Security Act, the cost of care up to a maximum of sixteen dollars a day per patient in fiscal 1974 and seventeen dollars a day per patient in fiscal 1975; for patients determined by the department of public welfare to need nursing care who receive such care in a home which meets federal requirements as an intermediate care facility under Title XIX of the Social Security Act, the cost of care up to a maximum of thirteen dollars and fifty cents a day per patient in fiscal 1974 and fifteen dollars a day per patient in fiscal 1975; for patients who are determined by the department of public welfare to need personal care and who are residents of nursing homes or rest homes which meet federal requirements under Title XIX of the Social Security Act, the cost of care up to a maximum of eight dollars a day per patient in fiscal 1974 and eight dollars a day in fiscal 1975.''

The following lines were disapproved June 29, 1973, by then Governor John J. Gilligan:

''provided that, notwithstanding the foregoing, so long as federal financial participation in reimbursement for nursing home care is not as a result withdrawn, the department of public welfare shall pay skilled nursing homes seventeen dollars a day per patient during fiscal 1975; intermediate nursing homes fifteen dollars a day per patient during fiscal year 1975; for rest home care eight dollars a day per patient during fiscal year 1975; and the paragraph following immediately below shall be inapplicable during fiscal year 1975. The foregoing rates are hereby determined to be reasonable costs for the care furnished in each category.''

The language of Am. Sub. H. B. No. 86 continues, as follows:

''During the period July 1, 1973 through June 30, 1974, nursing homes which do not submit cost information to the Department of Public Welfare in accordance with rules and regulations of the Department do not qualify for payment

under the preceding paragraph and shall be paid at a rate of: fourteen dollars a day per patient for skilled nursing care; ten dollars and twenty-seven cents a day per patient for intermediate nursing care; six dollars a day per patient for rest home care. The foregoing rates are hereby determined to be reasonable costs for the care furnished in each category.

"The foregoing payments shall be made in accordance with rules and regulations of the department of public welfare."

The primary contention of plaintiffs is that the veto by Governor Gilligan of the indicated portion of Am. Sub. H. B. No. 86 constituted an improper and unconstitutional veto; hence, the language remains a part of the law.

Clearly, if the language which was disapproved by the governor were left standing and a part of the act, flat rate payments of $17 and $15 a day for skilled and intermediate care nursing homes would be required during fiscal 1975.

Section 16, of Article II, of the Ohio Constitution, provides, in pertinent part, as follows:

"* * * The governor may disapprove any item or items in any bill making an appropriation of money and the item or items, so disapproved, shall be void, unless repassed in the manner prescribed by this section for the repassage of a bill."

Therefore, Governor Gilligan had constitutional authority to veto the provision for flat rate payments in 1975 as the reasonable cost if that particular provision constituted an "item."

The determination of what an "item" is in an appropriation bill is no longer a simple task. Appropriation bills often contain substantive provisions for spending the money appropriated, instructions to the executive branch of the government and alternative methods for funding governmental enterprises.

The Ohio Supreme Court has recently interpreted the constitutional provision for item vetoes, in State, ex rel. Brown, v. Ferguson (1972), 32 Ohio St. 2d 245. In the Fer-

*guson* case, the court held that an appropriation enabling the secretary of state to designate and employ independent counsel and to compensate such from the appropriation for the attorney general is an entirely separate item from the item of appropriation for the attorney general.

The Ohio Supreme Court, quoting the Supreme Court of Pennsylvania with approval, stated, at page 252, as follows:

" 'If the Legislature, by putting purpose, subject and amount inseparably together and calling them an item, can coerce the Governor to approve the whole or none, then the old evil is revived which this section was intended to destroy.' "

As also stated, while the legislature has ultimate control over appropriations, it cannot by any device deny the chief executive the power of veto over whatever they do. Thus, it has been held in Arizona, pursuant to a similar state constitutional provision, that wages and salaries of individual employees are separate items from the lump sum appropriation for the total salaries and wages. *Fairfield* v. *Foster* (1923), 25 Ariz. 146, 214 P. 319. The substance of the Ohio Supreme Court's holding in the *Ferguson* case was that if the vetoed provision is separate and distinct from the other provisions in the same bill, insofar as subject, purpose or amount are concerned, it constitutes a separate item under Section 16, Article II of the Ohio Constitution. Even that definition is far from clear, as opinions with regard to the broadness or narrowness of the subject, purpose or amount can vary widely.

Nevertheless, looking at the vetoed provision in comparison with the remaining appropriation which was left intact, we find that payments for fiscal 1975 were to be made according to the reasonable costs of care, up to a stated maximum. By that provision, nursing homes would be required to justify their reasonable costs before payment would be made. The vetoed portion removes the requirement of the nursing home to justify its actual reasonable cost and substitutes, instead, a flat rate which could conceivably result in payment to the nursing home for care to

medicaid patients of an amount greater than actually spent for that care. The subject of the vetoed item relates to compensation of nursing homes for medicaid patients and is the same. The purpose of the vetoed portion is different as it establishes a flat rate payment basis rather than an actual substantiated rate. The amount of the appropriation is different in the vetoed bill as compared to the other portion of the bill as it, undoubtedly, and according to the facts stipulated in this case, requires a greater appropriation than if nursing homes are required to substantiate their actual reasonable costs.

As pointed out, the method of setting forth separate items in an appropriation bill can lead to various reasonable interpretations of whether a particular provision constitutes a separate item or a part of an item. In order to preserve the constitutional division of power among the three branches of government, the determination of the executive branch of the government should be given great weight when the courts are asked to rule on the propriety of the veto of an "item." Obviously, in this particular instance, Governor Gilligan determined that the deleted language constituted a "separate item" which he could veto without vetoing the remainder of the appropriation for payment to nursing homes. For the reasons expressed herein, the vetoed portion is held to be a separate item, properly rejected by the Governor.

Plaintiffs further argue that Am. Sub. H. B. No. 86, even without the vetoed language, should be construed to mean that patients needing nursing care in 1975 must be paid on a flat rate basis. The argument is made that the act specifies a maximum in fiscal 1974, but does not set forth a maximum in fiscal 1975, because the words "the cost of care up to a maximum of" are not repeated for 1975. This construction is patently incorrect and obviously does not reflect the intent of the General Assembly. The particular bill is entitled: "Payments to nursing homes, including qualified public facilities for federal nursing home care, shall be made for reasonable costs of care for all eligible recipients on the following basis: * * *" The very heading

of the particular provision indicates that a reasonable cost of care basis is to be used, rather than a flat rate basis. Secondly, the actual language of the General Assembly indicates that "up to a maximum" applies both to the $16 per day per patient in 1974 and to the $17 per day per patient in 1975, and similarly to the $13.50 per patient in 1974 and $15 per patient in 1975. The particular provision is as follows:

"The cost of care up to a maximum of $16.00 a day per patient in fiscal 1974 and $17.00 a day per patient in fiscal 1975."

This is a provision for skilled nursing care and a similar but lower rate provision is contained in the act for intermediate nursing care. The particular grammar used is that of a compound prepositional phrase. "The cost of care up to a maximum of" has two objects, $16.00 a day per patient in fiscal 1974, and $17.00 a day per patient in fiscal 1975. There is no requirement, grammatically or otherwise, as argued by plaintiffs, to repeat the phrase "up to a maximum of" as that would be surplusage. The act is properly construed to read, "The cost of care up to a maximum of $16.00 a day per patient in fiscal 1974 and the cost of care up to a maximum of $17.00 a day per patient in fiscal 1975."

Furthermore, the vetoed section is surplusage for 1975 if the remaining language were to be interpreted as providing a flat rate payment for 1975. Obviously, the only correct interpretation of the law as it existed after Governor Gilligan properly exercised his veto is exactly as implemented by defendants. This assignment of error is overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

WHITESIDE and REILLY, JJ., concur.

WHITESIDE, J., concurring. This case involves a determination of the extent of the governor's item veto power with respect to bills making an appropriation of money. The

General Assembly has traditionally included some substantive provisions in appropriation bills. In recent years, the number and extent of substantive provisions in appropriation bills have increased.

There is of course a limit of the extent to which the General Assembly can go in including substantive provisions in appropriation bills in light of the requirement of Section 15(D), Article II, Ohio Constitution, that "no bill contain more than one subject."

Although the Governor has no item veto with respect to substantive provisions included in a bill not making an appropriation of money, where the General Assembly elects to include substantive provisions in a bill making an appropriation of money, the Governor's veto power extends to the items of the substantive provisions as well as to the items making appropriations. The item veto pursuant to Section 16, Article II, Ohio Constitution, extends to "*any* item or items in *any* bill making an appropriation of money," not merely to items of appropriation. (Emphasis added.)

An "item" subject to an item veto need not necessarily be a complete paragraph or even a complete sentence. Under proper circumstances, a single clause, a single phrase, or even a single word may constitute an "item" subject to the item veto. This is necessarily true for otherwise the General Assembly by clever structuring of language of a provision could deny the item veto power to the governor which would exist if separate items so cleverly connected were separately stated. As indicated in *State, ex rel. Brown, v. Ferguson* (1972), 32 Ohio St. 2d 245, the General Assembly cannot by any device deny the governor the power of item veto of *any* item in a bill making an appropriation of money.

Although the Supreme Court in *Brown* indicated that an item is something separate and distinct in subject and purpose from other provisions in the bill, "subject" and "purpose" here have a narrow import, since a bill may contain only one "subject" in any event.

The Supreme Court in *Brown* also indicated that the

test of whether language in a bill constitutes an item subject to veto is whether both the language vetoed and the remainder of the provisions from which such language is severed can each stand alone, that is whether they are severable so that each can stand independently of the other.

This determination, of necessity, must be made in the first instance by the Governor. The General Assembly, by the requisite three-fifths vote, may override the veto either because it feels the item not to be properly severable or because it feels the item should be enacted in any event. Once the Governor has made his determination, and the legislative process is complete, and the veto is allowed to stand, the courts should exercise great caution in "second-guessing" the governor as to whether the language vetoed constitutes a separate item subject to veto.

It is only where the governor has abused his discretion and the language vetoed *clearly* does not constitute a separate item subject to item veto that the courts should interfere in the legislative process and declare language vetoed to be law notwithstanding the attempted veto. In this case, we must give great weight to Governor Gilligan's determination that the vetoed language was subject to the item veto. In cases of doubt or uncertainty, the governor's determination should be allowed to stand.

Even accepting plaintiffs' contentions, the most that can be said is that it is unclear whether the language vetoed by Governor Gilligan was properly subject to the item veto. In such a situation, this court must defer to Governor Gilligan's determination. However, as expressed in the majority opinion, in this case, we conclude that Governor Gilligan correctly determined that the language vetoed was subject to the item veto.